OPINION
{¶ 1} Defendant-appellant, Mark A. Bedell, appeals from a judgment of the Franklin County Court of Common Pleas that convicted him of theft. For the following reasons, we affirm the judgment of the common pleas court.
 {¶ 2} By indictment filed on November 18, 2003, defendant was charged with theft, a violation of R.C. 2913.02 and a felony of the fifth degree, for allegedly stealing business machines from Angela McGraw, the owner of Another Level Beauty Salon. Ms. McGraw had leased the equipment to process financial transactions, such as credit card transactions. According to the indictment, defendant committed the alleged theft on or about May 30, 2003.
 {¶ 3} After deliberating, a jury delivered a verdict finding defendant guilty of theft as charged in the indictment. Following a sentencing hearing, the trial court imposed a six-month prison sentence and ordered defendant to pay $1,590 in restitution to Robert Hill, who paid a leasing company on Ms. McGraw's behalf and who provided the equipment to Ms. McGraw that defendant stole.
 {¶ 4} From the trial court's judgment defendant appeals and assigns two errors for our consideration:
FIRST ASSIGNMENT OF ERROR
 The jury verdict was not supported by sufficient credibleevidence and was against the manifest weight of the evidence. Asa result, Appellant was denied due process protections under thestate and federal Constitutions.
 SECOND ASSIGNMENT OF ERROR
 The trial court erred in admitting hearsay in violation of theOhio Rules of Evidence.
 {¶ 5} By his first assignment of error, defendant asserts his conviction for theft is supported by insufficient evidence and is against the manifest weight of the evidence.
 {¶ 6} When an appellant challenges his or her conviction as not supported by sufficient evidence, an appellate court construes the evidence in favor of the prosecution and determines whether such evidence permits any rational trier of fact to find the essential elements of the offense beyond a reasonable doubt.State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus, superseded by constitutional amendment on other grounds in State v. Smith (1997), 80 Ohio St.3d 89; State v.Thompkins (1997), 78 Ohio St.3d 380, 386, reconsideration denied, 79 Ohio St.3d 1451; State v. Conley (Dec. 16, 1993), Franklin App. No. 93AP-387. See, also, State v. Woodward,
Franklin App. No. 03AP-398, 2004-Ohio-4418, at ¶ 16, cause dismissed, 103 Ohio St.3d 1489, 2004-Ohio-5606, reconsideration denied, 104 Ohio St.3d 1428, 2004-Ohio-6585 (observing that in a sufficiency of the evidence review, an appellate court does not engage in a determination of witness credibility, rather "we essentially assume the state's witnesses testified truthfully and determine if that testimony satisfies each element of the crime").
 {¶ 7} Comparatively, when presented with a manifest-weight argument, an appellate court engages in a limited weighing of the evidence to determine whether the fact finder's verdict is supported by sufficient competent, credible evidence to permit reasonable minds to find guilt beyond a reasonable doubt.Thompkins, at 387; Conley; State v. Group,98 Ohio St.3d 248, 2002-Ohio-7247, at ¶ 77. "The question for the reviewing court [in a manifest-weight claim] is `whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against conviction.'" Id., quoting State v. Martin (1983),20 Ohio App.3d 172, 175. See, also, Thompkins, at 387.
 {¶ 8} Former R.C. 2913.02[1] provided, in part:
(A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:
(1) Without the consent of the owner or person authorized to give consent;
(2) Beyond the scope of the express or implied consent of the owner or person authorized to give consent;
(3) By deception;
(4) By threat;
(5) By intimidation.
(B)(1) Whoever violates this section is guilty of theft.
(2) * * * If the value of the property or services stolen is five hundred dollars or more and is less than five thousand dollars or if the property stolen is any of the property listed in section 2913.71 of the Revised Code, a violation of this section is theft, a felony of the fifth degree. * * *
See, also, R.C. 2901.22(A) (defining culpable mental state of "purposely");[2] R.C. 2901.22(B) (defining culpable mental state of "knowingly");[3] R.C. 2913.01(A) (defining "deception");[4] former R.C. 2913.01(C) (defining "deprive");[5] former R.C. 2913.01(D) (defining "owner");[6] former R.C. 2913.01(E) (defining "services").[7]
 {¶ 9} Accordingly, pursuant to former R.C. 2913.02, the state had the burden of proving beyond a reasonable doubt that: (1) defendant had purpose to deprive the owner of property or services; (2) defendant knowingly obtained or exerted control over either the property or services; (3) it was without the consent of the owner or person authorized to give consent, or (4) it was beyond the scope of express or implied consent of the owner or person authorized to give consent; or (5) it was by deception, or (6) it was by threat. See, generally, State v.Adams (1980), 62 Ohio St.2d 151, 153, citing Mullaney v.Wilbur (1975), 421 U.S. 684, 95 S.Ct. 1881 (stating that "[t]he state has the burden of establishing all material elements of a crime by proof beyond a reasonable doubt").
 {¶ 10} According to the state's evidence, Angela McGraw is the owner and operator of Another Level Beauty Salon in Columbus, Ohio. (Tr. Vol. II, 32.) In 2003, defendant and another person, Mr. Early, approached Ms. McGraw about installing a credit card machine in her beauty salon. (Id. 34-35; 65.) After Ms. McGraw met with defendant in February 2003, she agreed to have a credit card processing machine and a check-reader machine installed in her salon and leased the equipment for four years. (Id. 35-36; 54, 56.)
 {¶ 11} According to Ms. McGraw, after the equipment was installed, the check-reader machine failed to work properly, and later the credit card processing machine also failed to work properly. (Id. 37.) Ms. McGraw contacted defendant about the malfunctioning equipment. (Id.) In response, defendant sent a representative to service the equipment. (Id.) After this representative serviced the equipment, the equipment functioned properly for a brief time before it again failed to work. (Id.) Ms. McGraw then contacted defendant again about the malfunctioning equipment. (Id.)
 {¶ 12} According to Ms. McGraw, defendant informed her that "he would get me out of the lease that I was in, into another piece of equipment, paying a lower rate for the equipment, and he would just take away the — have them to take away the check machine and send that back." (Id. 38.) According to Ms. McGraw, although she gave defendant permission to remove the check reader machine, she did not give defendant permission to remove the credit card processing machine. (Id.) Later, absent Ms. McGraw's approval or knowledge, on or about May 30, 2003, defendant removed the credit card processing machine from her beauty salon. (Id. 39; 77-78.)
 {¶ 13} After discovering that defendant had removed the credit card processing machine from her business, Ms. McGraw contacted defendant. (Id. 39.) Defendant informed Ms. McGraw that "he had another representative that was coming back to replace the old machine with the new one." (Id.) According to Ms. McGraw, she asked defendant to return her credit card processing machine. (Id. 40.) Ms. McGraw testified:
* * * I told him that he needs to bring it back because I was getting notification from Northern Leasing Company, who — which is where I was doing the leasing through — Mark Bedell told me that he had terminated that contract, put me in a new contract. Northern Leasing was still taking monthly payments out of my account.
(Id.)
 {¶ 14} In response, defendant informed Ms. McGraw that the contract should have been terminated and he would contact Northern Leasing Company. (Id. 41.) Ms. McGraw testified:
He said that that contract should have been terminated, that he would contact them.
I asked him could he please bring that machine so I can send it back because that machine — that lease is in my name, and I'm being held responsible for that. They were taking funds out of my business account, and I didn't even have the equipment.
So after explaining to Northern Leasing the whole entire situation, they said that the contract had never been terminated. * * *
(Id.)
 {¶ 15} Ms. McGraw further testified that, after informing defendant about her conversation with Northern Leasing, "[defendant] told me that the contract should be — Mark Bedell told me that the contract should be terminated and that he was not returning the machine back to me." (Id. 42.) According to Ms. McGraw, she eventually resolved her dispute with Northern Leasing and received a refund from them. (Id. 42-43.)
 {¶ 16} Ms. McGraw also testified that she felt that defendant had taken advantage of her. (Id. 43-44.) Ms. McGraw testified: "I felt like Mark Bedell took advantage of me because the lease was in my name. The equipment was in my name. He took it without my permission. I asked him to bring it back. He did not bring it back. So that means I was held liable for that, and Mark Bedell had the equipment." (Id. 44.) Because she felt that defendant had taken advantage of her, Ms. McGraw filed a police report on July 21, 2003, seeking charges against defendant. (Id. 44-45; 77.) According to Ms. McGraw, the credit card processing machine was valued at $1,500, and the check-reader machine was valued at $1,560. (Id. 49.)
 {¶ 17} On cross-examination of Ms. McGraw, defense counsel inquired about discrepancies between Ms. McGraw's trial testimony and the contents of a police report. (Id. 63-65). Defense counsel also inquired about a letter that Ms. McGraw purportedly sent to Chase Manhattan Bank wherein Ms. McGraw allegedly informed the bank that she was canceling the lease agreement. (Id. 57.) Ms. McGraw testified that the signature on the letter was hers, but she did not recall the letter. (Id. 57-58.) Ms. McGraw further testified that she did not recall having an account with Chase Manhattan Bank. (Id. 58.) Later, on redirect examination, Ms. McGraw clarified that "I do remember Mark Bedell saying that he will also try to get a leasing through Chase Manhattan. But from my knowledge, we didn't go through Chase Manhattan. We only went through Northern Leasing." (Id. 72.)
 {¶ 18} Robert Hill also testified at trial on behalf of the state. Mr. Hill is the owner of Universal Payment Consultants, a credit card processing company. According to Mr. Hill, Universal Payment Consultants provides, among other things, equipment and financing through a lease company to new merchants or merchants who may need his company's services. (Id. 83.) Mr. Hill testified that "[w]e buy the equipment wholesale. We program it. We install it. We do everything from one end to the other." (Id. 84.) Mr. Hill testified that his company representative is not paid until after the equipment has been installed and is functioning, a merchant is trained, and a lease is verified. (Id. 83.)
 {¶ 19} Mr. Hill testified that he became acquainted with defendant after "[defendant] came to me and explained to me that he was having some issues getting financing done and acquiring equipment — apparently he was not taking care of the financial end of the business — and asked me if I could be of any assistance to him. Without doing my due diligence, I jumped forward into this venture and did — I guess that's the reason why I'm here today." (Id. 84-85.) Mr. Hill further testified: "Mr. Bedell, in the two deals that we were able to get done, worked as a representative of my company, using my equipment, using my financing, and which in the end leaves me ultimately responsible." (Id. 85.) According to Mr. Hill, defendant was paid on a commission basis after a lease company funded Mr. Hill's company. (Id.)
 {¶ 20} Mr. Hill further explained:
* * * Basically [defendant] explained to me that he had some merchants that he could not get placed with other companies, whether it was for financing reasons on the lease end or he was having problems getting equipment.
He was to go out and take an application, bring that application to my office. We processed that application. Based on the merchant's credit, he offered them a deal or a lease price, a monthly rental agreement that they would pay into for 48 months. At the end of that period, they own that piece of equipment.
He was to take that piece of equipment that we had downloaded, take it to the merchant's place of business, install it, and train them. Once we had the equipment in and the customer trained, he was supposed to call the leasing company.
And the leasing company would want to know several things. They want to know that the equipment is there, that it's accepted by the merchant. They want to know that it is working. They want to ask the merchant if they have any questions. They let them know exactly what their lease payments are going to be and for how many months.
That was [sic] Mr. Bedell's responsibilities to me.
(Id. 85-86.)
 {¶ 21} Mr. Hill confirmed that his company transacted business with Ms. McGraw by providing her with a "Lipman Nurit, 2085" with an "RDM check reader, 5000 series." (Id. 86-87.) According to Mr. Hill, "the credit card machine allow[ed] [Ms. McGraw] to accept MasterCard, VISA, Discover, and American Express at her place of business." (Id. 87.) Mr. Hill also explained:
The check reader does, what we call, check truncation. What that does is it takes a check and runs it around, takes a picture of that image and turns that transaction into an electronic transaction like a MasterCard and VISA. In other words, you could give the customer back their check. You've already taken a picture of the front and the back. You don't have to take the checks to the bank. At the end of the night when you settle, you just upload the images and the monies to your account.
(Id. 87-88.)
 {¶ 22} According to Mr. Hill, Ms. McGraw leased both pieces of equipment at a cost of $89 per month for 48 months. Mr. Hill testified that at the end of the lease agreement, Ms. McGraw would own both pieces of equipment. (Id. 88.) Mr. Hill further testified that he assisted in the installation of the check reader because defendant was unfamiliar with an "RDM" model. (Id.) After the machine was installed and operational, Mr. Hill had no further contact with defendant until the leasing company contacted him. (Id. 89.) Later, after Mr. Hill contacted Ms. McGraw, it became apparent to Mr. Hill that there was fraudulent activity and, as a consequence, he contacted police. (Id. 90-91.) On cross-examination, Mr. Hill testified:
* * * I was actually faxed a copy of the police report by Northern Leasing. She had already gone to the police. And they asked me to further investigate this matter because of my relationship with them. They have nobody down here to find out what the story was, and if — if I hadn't gotten a call from Northern Leasing, I would have assumed she was a very happy merchant who had no problems whatsoever.
(Id. 109.)
 {¶ 23} Mr. Hill also testified that he later contacted defendant about the missing credit card machine. (Id. 92.) According to Mr. Hill, defendant informed him that he was evicted; he no longer had the machine; and the machine was taken while he was in jail. (Id.)
 {¶ 24} Mr. Hill testified that he had no explanation why the credit card machine would have been taken from Ms. McGraw's business. (Id.) According to Mr. Hill, his company was paid every time a credit card machine processed a transaction and, therefore, it was in his own interest to make sure that Ms. McGraw had a machine that properly operated. (Id.) Mr. Hill also testified that he did not give defendant permission to take the credit card machine from Ms. McGraw's salon (id. 93), and he did not give defendant any permission to cancel any lease. (Id. 94.)
 {¶ 25} Mr. Hill also testified that he had personal knowledge that Ms. McGraw had been made whole for her loss. (Id. 93.) Mr. Hill testified: "Basically, Miss McGraw was stuck with two leases, and I thought it was in my best interest and her best interest to buy her second lease out, her official lease, and I just paid the leasing company exactly what they funded." (Id.) According to Mr. Hill, his company paid $2,103.95 to the leasing company. (Id.)
 {¶ 26} Mr. Hill also testified that, under the terms of her lease agreement, Ms. McGraw had a "noncancellable lease." Mr. Hill testified:
A noncancelable lease means you were on the lease for the total amount of the lease. * * * If you don't pay, collections will be calling you. A lease is not cancelable.
* * * [T]he lease and the manufacturer have nothing to do with each other. There is a warranty on the equipment from the manufacturer. * * * If that machine fails, either you're going to see a sales rep or the brown truck the next day.
(Id. 96.)
 {¶ 27} On cross-examination, Mr. Hill did not agree with defense counsel's suggestion that the issue in this case was that Ms. McGraw was "stuck with two leases." (Id. 101.) Mr. Hill testified that "[t]he only reason Miss Angela has two leases is because Mr. Bedell fraudulently removed a piece of equipment without her permission or even notifying me. That's how she got two leases." (Id. 101-102.) According to Mr. Hill, "[i]f the machine wasn't working, Mr. Bedell should have called me, and I would have replaced that machine within 24 hours. She's in my backyard. She would have had it in less than that." (Id. 102.) Mr. Hill further testified that "I wasn't notified that there was even an issue until like six months later." (Id.) According to Mr. Hill, "[t]he reason [Ms. McGraw] has two leases is because Mr. Bedell told her she had — he had canceled the first one. She has a letter to Northern Leasing explaining to them that Mr. Bedell told her that the lease was canceled, and that was not the case." (Id. 108.)
 {¶ 28} Arthur Brown, a deputy bailiff for Franklin County, Ohio, also testified on behalf of the state. Mr. Brown testified that his duties included, among other things, to assist with "[e]victions, executions, cash register tapes, reprocessing cars, pick up furniture. Mainly it's on evictions." (Tr. Vol. III, at 122-123.) According to Mr. Brown, on June 23, 2003, he supervised a "sit-out" [sic.] of property associated with defendant's eviction from an apartment. (Id. 124; 126.) Mr. Brown testified, however, that he did not recall seeing a credit card reader machine among defendant's property (id. 124-125), and he did not know whether a credit card reader machine was among defendant's belongings that were removed from defendant's apartment. (Id. 128.)
 {¶ 29} Detective Carl Covey of the Columbus Division of Police also testified on behalf of the state. According to Detective Covey, he was in charge of the investigation of the alleged theft from Ms. McGraw's business. (Id. 131.) Detective Covey testified that he interviewed defendant after advising defendant of his rights. (Id. 133, 136.) Detective Covey testified, in part:
I asked [defendant] if he went to the shop owned by Angela McGraw, and he stated that he did.
I asked if he removed machinery that was in the shop, and he stated that he did. He told me he thought it was in February that he removed the machinery. He also stated that he replaced the machinery with another machine.
During the interview, I stopped the interview and left the room and contacted the victim to verify and make sure that he was the one that brought another machine into her shop. [Ms. McGraw] stated no —
* * *
* * * [Ms. McGraw] stated that he had taken the machine out of her shop. She contacted another agency to bring another machine to her shop.
(Id. 136-137.)
 {¶ 30} According to Detective Covey, he also spoke with another person, Mr. Early, who was not a suspect and who supposedly was with defendant when he took the machine. (Id. 137.) After speaking with Mr. Early and Ms. McGraw, Detective Covey again spoke with defendant. (Id. 138.) According to Detective Covey, he found discrepancies between Ms. McGraw's statement and defendant's statement, including the date when the equipment was purportedly removed from Ms. McGraw's salon. (Id. 139.) Detective Covey also testified that, when he asked defendant why he failed to return equipment to Mr. Hill, "[defendant] stated that Robert Hill owed him money and that he had not returned the machine to him for services done. * * * [D]efendant said that Robert Hill — said he kept the machines from Robert Hill because Robert Hill still owed him $500 for that contract with Ms. McGraw." (Id. 148-149.)
 {¶ 31} In his defense, defendant called Mr. Early, a former employee of International Bank Card, to testify on his behalf. (Id. 153.) According to Mr. Early, he and defendant were business partners and sold bank machines. (Id. 155.) Mr. Early testified, in part:
* * * See, the bank machines, they swipe your VISA and MasterCard, but we also needed machines for the check printers because the fact that we wanted people to not only have a VISA and MasterCard machine but also to be able to take checks and to take checks without them being bogus checks, that the machine could read the check and let you know if the check is good, bad, or indifferent from the start.
So that's the reason why we were trying to team up with Mr. Hill to provide another service for our clientele.
And, well, he gave us a machine, a bank machine and a check reader, and that's when we took the machine to the lady in question. * * *
(Id. 155-156.)
 {¶ 32} According to Mr. Early, after Ms. McGraw called defendant to complain about a machine, he and defendant went to Ms. McGraw's business to replace the purportedly defective machine with Ms. McGraw's consent. (Id. 156-157.) Mr. Early also testified that, at one point, he and Mr. Hill went to Ms. McGraw's business to correct a problem with the check reader, but according to Mr. Early, he and Mr. Hill "really never got it corrected." (Id. 174-175.)
 {¶ 33} According to Mr. Early, when he and defendant replaced the purportedly defective machine, they used a different supplier instead of Mr. Hill. (Id. 157.) Mr. Early testified that he understood that the agreement for the credit card machines with Mr. Hill was supposed to be terminated. (Id.) Mr. Early also testified that he was present when Ms. McGraw signed two lease agreements for equipment. (Id. 161-162.)
 {¶ 34} As to whether defendant replaced the credit card reader, Mr. Early testified: "Maybe — I maybe talked to the Detective and told him [defendant] may not have replaced it that day, but he did replace it. There's no question — there's no doubt in my mind there. Now, whether it was that day, I don't recall that day, but I do recall him replacing it." (Id. 166.)
 {¶ 35} Mr. Early further testified that the credit card machine was removed from Ms. McGraw's business in approximately February or March 2003; however, he did not know why defendant failed to return the machine to Mr. Hill shortly after its removal. (Id. 172.) Mr. Early denied, however, that defendant kept the machine because defendant was owed a commission by Mr. Hill. (Id. 172-173.) Mr. Early testified:
That was not the case at all because the fact we did get our commissions, although it was, like I said, two weeks later, that had nothing to do with the machine.
Like I said, the machine was defective. If I can recall and to the best of my knowledge, I think that Mr. Bedell was trying to get someone to repair the machine. That's the only — you, know, the only thing that I can, you know, say, but it wasn't because of the commission, no, no. Why would he want to keep a machine anyway that was defective? That doesn't make sense.
(Id. 173.)
 {¶ 36} Claiming that Mr. Hill was not a "reputable dealer," (id. 169), Mr. Early also testified that he and defendant had unsuccessfully attempted to arrange a business relationship between themselves and Mr. Hill. (Id. 165.)
 {¶ 37} Defendant also testified on his own behalf. Defendant testified that he was originally from Cleveland, Ohio, and he moved to Columbus, Ohio, following the death of his mother in 1998 "where I became the owner of International Bank Card Corporation." (Id. 178.) Prior to beginning this business, defendant was a bail bondsman. (Id. 179.)
 {¶ 38} According to defendant, at one point the leasing company that defendant used in his business declined to accept any more leases from defendant's company. (Id. 182.) Thereafter, defendant contacted Mr. Hill who agreed "to do the deal, the lease, but I provided the processing." (Id.)
 {¶ 39} Defendant testified that, after the machines were installed in Ms. McGraw's business, she called defendant and complained that the machines did not work properly. (Id. 186.) Defendant testified, in part:
* * * [S]he contacted me and was complaining thoroughly about this machine didn't work, this machine didn't work.
Now — so what I decided to do, I said, "Well, Angie, I'll give you the money that you paid for the machine," so which then she didn't mention with the tax that was included on just the terminal alone was a hundred dollars. The check through Telecheck, the service costs $40 a month. So I went and dug in my pocket, and I gave Angela a hundred forty dollars because the equipment was malfunctioned. I said, "You know what, Angie? I'm going to sell you another machine."
At that point, me and Mr. Hill started to fall out * * *.
(Id. 186-187.)
 {¶ 40} Defendant seemed to dispute Mr. Hill's testimony that Mr. Hill's company was paid every time a credit card machine processed a transaction and, therefore, it was in Mr. Hill's own interest to make sure that Ms. McGraw had a machine that properly operated. When queried whether Mr. Hill received residual income from an installed credit card machine, defendant testified:
Not from the credit card machine, he didn't, and he wouldn't get residuals off of the — every time the credit card was swiped because that went under my sales code number under merchant services, so he didn't make a dime. That went directly to me.
(Id. 184.)
 {¶ 41} Defendant also disputed Mr. Hill's testimony that the lease agreement was "noncancelable." Defendant claimed that he wrote a cancelation letter to Chase Manhattan Merchant Services, and he claimed that he sent this letter. (Id. 188, 210.)
 {¶ 42} Defendant also testified: "So what I did was, to protect Angela, I sold her another equipment from a company that she testified from that she said that she had called Retriever. * * * I got her deal done with Retriever and C.I.T. Leasing." (Id. 189.)
 {¶ 43} Defendant admitted to past financial difficulties and he claimed that Mr. Hill failed to pay him in a timely manner. Defendant also admitted that in the past he had been in arrears in child support payments. (Id. 194-195.) Defendant further admitted to having had a car repossessed and to having been evicted from his apartment in the past. Defendant claimed that the credit card machine and the check reader that Mr. Hill gave him to install in Ms. McGraw's business had been in a box in his apartment from which he had been evicted. (Id. 195.) Defendant also testified that he had kept the equipment because he believed Mr. Hill owed him an additional $500. (Id. 197-198.)
 {¶ 44} In a criminal or civil case, a determination of the weight of the evidence and credibility of witnesses is primarily for the trier of facts. State v. DeHass (1967),10 Ohio St.2d 230, paragraph one of the syllabus. In Woodward, supra, this court explained:
* * * [T]he jury is free to believe all, part, or none of the testimony of each witness who appears before it. State v. Long
(1998), 127 Ohio App.3d 328, 335. The jury is in the best position to view the witnesses and observe their demeanor, gestures and voice inflections, and use those observations in weighing the credibility of the testimony. State v. Wright,
Franklin App. No. 03AP-470, 2004-Ohio-677, at ¶ 11. Thus, a reviewing court may not second guess the jury on matters of weight and credibility. Id.
Id. at ¶ 18.
 {¶ 45} Here, the jury apparently found the testimony of the state's witnesses to be credible and to have weight. In the present case, the testimony of Ms. McGraw, if believed by the jury, supports a reasonable conclusion that, absent Ms. McGraw's consent, defendant had a specific intention to deprive her of control of a credit card machine of which she had lawful possession, and which, according to Ms. McGraw was valued over $500 but less than $5,000. Because defendant removed the credit card machine from Ms. McGraw's business when she only gave defendant authority to remove a check reader from her business, a jury reasonably could conclude that defendant exceeded Ms. McGraw's authorization. Also, because defendant failed to cancel a lease as promised and kept property that he removed from Ms. McGraw's business, a jury reasonably could conclude that defendant deceived Ms. McGraw and exerted control over her property through this deception. Indeed, according to Ms. McGraw's testimony, defendant refused to return the credit card machine even after she expressly requested its return because he claimed that the lease agreement had been canceled.
 {¶ 46} Accordingly, construing the evidence in favor of the prosecution, we hold that there is sufficient evidence to permit any rational trier of fact to find that defendant committed theft, a felony of the fifth degree, beyond a reasonable doubt. Moreover, after reviewing the evidence, we cannot conclude that in resolving evidentiary conflicts the jury clearly lost its way and created a manifest miscarriage of justice such that defendant's conviction must be reversed. Accordingly, we also hold that the jury's verdict is not against the manifest weight of the evidence. Therefore, we overrule defendant's first assignment of error.
 {¶ 47} Defendant's second assignment of error asserts that the trial court erred by admitting hearsay evidence.
 {¶ 48} "A trial court has broad discretion in the admission or exclusion of evidence, and its judgment will not be reversed absent a clear showing of an abuse of discretion with attendant material prejudice to the defendant." State v. Rowe (1993),92 Ohio App.3d 652, 665, reconsideration denied (Feb. 10, 1994), Franklin App. No. 93AP-1763, dismissed, jurisdictional motions overruled (1994), 69 Ohio St.3d 1403, citing State v. Hymore
(1967), 9 Ohio St.2d 122, certiorari denied, Hymore v. Ohio
(1968), 390 U.S. 1024, 88 S.Ct. 1409. See, also, Schultz v.Schultz (1996), 110 Ohio App.3d 715, 726, citing Krischbaum v.Dillon (1991), 58 Ohio St.3d 58, 66 (stating, in part, that "[i]n the absence of an abuse of that discretion which results in a material prejudice to a defendant, an appellate court should be slow to reverse evidentiary rulings").
 {¶ 49} An "abuse of discretion" "connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." Adams, supra, at 157, citing Steiner v. Custer (1940), 137 Ohio St. 448; Connerv. Conner (1959), 170 Ohio St. 85; Chester Twp. v. Geauga Cty.Budget Comm. (1976), 48 Ohio St.2d 372. When applying the "abuse of discretion" standard, an appellate court is not free to merely substitute it judgment for that of the trial court. State v.Sibert (1994), 98 Ohio App.3d 412, 424, motion for delayed appeal denied (1995), 71 Ohio St.3d 1479.
 {¶ 50} Evid.R. 801(C) defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." "To constitute hearsay, two elements are needed. First, there must be an out-of-court statement. Second, the statement must be offered to prove the truth of the matter asserted. If either element is not present, the statement is not `hearsay.'" State v. Maurer (1984) 15 Ohio St.3d 239, 262, certiorari denied (1985), 472 U.S. 1012, 105 S.Ct. 2714, rehearing denied (1985), 473 U.S. 924, 106 S.Ct. 16, citingPotter v. Baker (1955), 162 Ohio St. 488. (Footnote omitted.)
 {¶ 51} In Maurer, the Supreme Court of Ohio explained that "[i]n State v. Thomas (1980), 61 Ohio St.2d 223, 232, 400
N.E.2d 401 [15 O.O.3d 234], we held that testimony which explains the actions of a witness to whom a statement was directed, such as to explain the witness' activities, is not hearsay." Id. at 262. The Maurer court further explained that "it is non-hearsay if an out-of-court statement is offered to prove a statement was made and not for its truth * * * to show a state of mind * * * or to explain an act in question." Id. (Citations omitted.)
 {¶ 52} In State v. Blevins (1987), 36 Ohio App.3d 147, this court observed that although statements that are offered to explain an officer's conduct are not hearsay, "the potential for abuse in admitting such statements is great where the purpose is merely to explain an officer's conduct during the course of an investigation." Id. at 149, citing McCormick, Evidence (3 Ed. Cleary Ed. 1984), 732, 734, Section 249. The Blevins court therefore stated that "certain conditions should be met before the court admits statements which explain an officer's conduct during the course of a criminal investigation." Id. at 149. According to Blevins, "[t]he conduct to be explained should be relevant, equivocal and contemporaneous with the statements," id., citing 6 Wigmore, Evidence (Chadburn Rev. Ed. 1976, 267, 268, Section 1772), and "[a]dditionally, such statements must meet the standard of Evid.R. 403(A)." Id. at 149. See, generally, Evid.R. 403(A) (providing that "[a]lthough relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury").
 {¶ 53} Here, defendant asserts the trial court allowed prejudicial hearsay during two exchanges. In the first challenged exchange, the following occurred:
Q. [By assistant prosecutor]: Taking your attention back to approximately the 30th day of May 2003, at any time on or about that time, did you learn that there was a problem with the transaction, Ms. McGraw, the machine, and Mr. Bedell?
A. [By Mr. Robert Hill]: Initially when that terminal was installed, Mr. Bedell was not familiar with an RDM. He had no previous knowledge of using that terminal for the check conversion.
I did go to the place of business. I did get the terminal up and running, and we did get it lease verified. That was the last contact that I had until the lease company called me back in — on the 29th of August to let me know that Mr. Bedell had taken the equipment —
MR. JELEN [Defense Counsel]: Objection. Hearsay.
THE COURT: Overruled.
Q. As a result of what the lease company told you, sir, go on.
A. The lease company basically told me they were going to take back the funding on that lease because there was fraudulent activity reported by the merchant. And they asked me to talk to the merchant and to find out exactly what the issue was and report back to them, and that's exactly what I did. And that's when I found out that the equipment had been removed. Prior to that, I had no knowledge.
THE COURT: Let me stop you, Mr. Sika.
Ladies and gentlemen of the jury, the statements by the leasing company are not offered for the truth. That is, they're not proof to you that any fraud took place. They're merely offered as background to what Mr. Hill did.
Go ahead.
(Tr. Vol. II, 88-89.)
 {¶ 54} Here, Mr. Hill's testimony that the leasing company informed him that "Mr. Bedell had taken the equipment" and that "there was fraudulent activity reported by the merchant" suggested that defendant engaged in fraudulent activity, and this testimony exceeded a foundational basis for explaining why Mr. Hill contacted Ms. McGraw. Thus, the probative value of such testimony was substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.
 {¶ 55} However, although we agree with defendant that the trial court erred by allowing such testimony, we cannot conclude that the admission of this testimony constituted prejudicial error in this case. Here, apparently recognizing the possible prejudicial nature of Mr. Hill's testimony, the trial court interrupted the state's inquiry and issued a cautionary instruction advising the jury that the leasing company's statements were not offered for their truth, only as background for explaining why Mr. Hill contacted Ms. McGraw. Unless it is proven otherwise, a jury is presumed to follow such instruction.State v. Mason (1998), 82 Ohio St.3d 144, 157, reconsideration denied, 82 Ohio St.3d 1483, certiorari denied, 525 U.S. 1057,119 S.Ct. 624. See, also, State v. Hancock, 108 Ohio St.3d 57,2006-Ohio-160, at ¶ 54, reconsideration denied,108 Ohio St.3d 1513, 2006-Ohio-1329, citing State v. Ahmed, 103 Ohio St.3d 27,2004-Ohio-4190, at ¶ 147, reconsideration denied,103 Ohio St.3d 1496, certiorari denied (2005), 544 U.S. 952, 125 S.Ct. 1703, rehearing denied (2005), 545 U.S. 1124, 125 S.Ct. 2901 (stating that "[i]t is presumed that the jury obeys the instructions of the trial court"); State v. Garner (1995), 74 Ohio St.3d 49,59, reconsideration denied, 74 Ohio St.3d 1495, certiorari denied (1996), 517 U.S. 1147, 116 S.Ct. 1444, rehearing denied (1996),517 U.S. 1230, 116 S.Ct. 1872.
 {¶ 56} Because it is presumed that a jury obeys a trial court's instructions, we therefore presume that in this case the jury obeyed the trial court's cautionary instruction. Finding nothing in the record to dismiss this presumption, we cannot conclude that the admission of Mr. Hill's testimony necessarily constitutes reversible error. Furthermore, because at trial defendant himself admitted to removing equipment from Ms. McGraw's business, Mr. Hill's testimony suggesting that defendant removed equipment from Ms. McGraw's business is not prejudicial.
 {¶ 57} Accordingly, absent a showing of material prejudice, we cannot conclude that the trial court abused its discretion by allowing the admission of the challenged testimony.
 {¶ 58} In the second challenged exchange, the following occurred:
Q. [By assistant prosecutor]: In your speaking with Mr. Early, did you inquire of details that were related to you by Mr. Bedell?
A. [By Detective Covey]: Yes.
Q. As a result of speaking to Mr. Bedell and then Mr. Early, did you find it necessary to go back and speak with Mr. Bedell again?
A. Yes.
Q. Why was this?
A. Because Mr. Early's testimony was the same as Mrs. McGraw where he had taken machinery out and never brought machinery back in.
MR. JELEN: I object to that.
THE COURT: Well, ladies and gentlemen of the jury, we're dealing here with why the officer asked certain questions of Mr. Bedell and not about the truth of what Mr. Early said or didn't say or not of the truth of what Miss McGraw said. Miss McGraw's [sic] already told you in person what she think's [sic] happened. That's what's evidence. This is merely background, and you shouldn't consider the fact that the officer talked to these other people and what they said as anything more than mere background. Don't consider it as evidence of the truth or falsity of the charge against Mr. Bedell.
Q. [By Mr. Sika]: Did you find discrepancies between Mr. Bedell's statements and your understanding of the situation as it occurred with Angela McGraw?
A. Yes.
Q. What discrepancies did you find between Miss McGraw's statements and Mr. Bedell's?
A. Two things. One, when it occurred. He stated February. She stated May when she filed the report stating that — Mr. Early, in May, he believed the machine was taken out also. When I went back in and spoke with Mr. McGraw after speaking to the victim and to Mr. Early —
THE COURT: I think you misspoke. When you went back in and talked to Mr. Bedell.
A. Yeah, I mean Mr. Bedell. Sorry. Mr. Bedell stated that it could have been in May after I explained to him what two other individuals had said, but then he didn't want to proceed any longer with the interview. The interview ended.
THE COURT: Any further questions, Mr. Sika?
MR. SIKA: Just a few seconds, please, your honor.
THE COURT: All right.
(Tr. Vol. III, at 137-139.)
 {¶ 59} Defendant contends that incriminating statements by Mr. Early against defendant were not necessary to explain why Detective Covey sought to interview defendant and, therefore, the trial court erred by allowing this testimony to be admitted.
 {¶ 60} Here, apparently sustaining defense counsel's objection, the trial court issued a cautionary instruction advising the jury that Mr. Early's statements and Ms. McGraw's statements were mere background, and instructing the jury that the out-of-court statements should not be considered as evidence of the truth or falsity of the charge against defendant. Because a jury is presumed to follow such instruction, unless it is proven otherwise, Mason, at 157, we presume in this instance, as we did when considering defendant's other challenged exchange, that the jury obeyed the trial court's cautionary instruction. Furthermore, we find nothing in the record to dismiss this presumption that the jury obeyed the trial court's instruction. Accordingly, absent a showing of material prejudice, we cannot conclude that the trial court abused its discretion by allowing the admission of this challenged testimony.
 {¶ 61} Therefore, for the foregoing reasons, we overrule defendant's second assignment of error.
 {¶ 62} Accordingly, having overruled both of defendant's assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.
Judgment affirmed.
Klatt, P.J., and Brown, J., concur.
[1] Since May 2003 when defendant allegedly committed theft, R.C. 2913.02 has been amended multiple times. See (2003) Am. Sub. H.B. No. 7; (2003) Sub. H.B. No. 179; (2004) Am. Sub. H.B. No. 12; (2004) Am. Sub. H.B. No. 369; (2004) Sub. H.B. No. 536; and (2006) Am. Sub. H.B. No. 530.
[2] R.C. 2901.22(A) provides: "A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature."
[3] R.C. 2901.22(B) provides: "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist."
[4] Since May 2003 when defendant allegedly committed theft, R.C. 2913.01 has been amended multiple times. See (2003) Am. Sub. S.B. No. 82; (2004) Am. Sub. S.B. No. 146; (2004) Am. Sub. H.B. No. 369; (2004) Sub. H.B. No. 536; (2004) Am. Sub. H.B. No. 361; and (2006) Am. Sub. H.B. No. 530.
Former R.C. 2913.01(A) provided: "`Deception' means knowingly deceiving another or causing another to be deceived by any false or misleading representation, by withholding information, by preventing another from acquiring information, or by any other conduct, act, or omission that creates, confirms, or perpetuates a false impression in another, including a false impression as to law, value, state of mind, or other objective or subjective fact."
[5] Former R.C. 2913.01(C), which was in effect at the time of the alleged theft, provided:
"Deprive" means to do any of the following:
(1) Withhold property of another permanently, or for a period that appropriates a substantial portion of its value or use, or with purpose to restore it only upon payment of a reward or other consideration;
(2) Dispose of property so as to make it unlikely that the owner will recover it;
(3) Accept, use, or appropriate money, property, or services, with purpose not to give proper consideration in return for the money, property, or services, and without reasonable justification or excuse for not giving proper consideration.
[6] Former R.C. 2913.01(D) provided: "`Owner' means, unless the context requires a different meaning, any person, other than the actor, who is the owner of, who has possession or control of, or who has any license or interest in property or services, even though the ownership, possession, control, license, or interest is unlawful."
[7] Former R.C. 2913.01(E) provided: "`Services' includes labor, personal services, professional services, public utility services, common carrier services, and food, drink, transportation, entertainment, and cable television services and, for purposes of section 2913.04 of the Revised Code, include cable services as defined in that section."